IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STACEY WILEY,                           )
                        Plaintiff,      )
                                        )
        vs                              )        Civil Action No. 17-1214
                                        )
LAWRENCE COUNTY,                        )
                        Defendant.      )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Stacey Wiley, brings this action against Defendant, Lawrence County, alleging claims of gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (Title VII) and the Pennsylvania Human Relations Act, 43 P.S. §§ 951-63 (PHRA). Plaintiff contends that the County improperly terminated her from her employment as a Humane Officer/Detective on January 5, 2017.

Currently pending before the Court is a motion for summary judgment, filed by Defendant. Plaintiff has filed a brief in opposition and Defendant has filed a reply brief. In addition, Defendant has filed a motion to strike the declaration of Andrew J. Petyak, Jr. that Plaintiff submitted in support of her response to the motion for summary judgment, and Plaintiff has filed a brief in opposition to that motion. For the reasons that follow, the motion to strike will be granted in part and denied in part and the motion for summary judgment will be denied.

Facts

The District Attorney is an elected "Row Officer" pursuant to the Pennsylvania Constitution, Pa. Const. Article IX § 4, and the County Code, 16 P.S. §§ 1608, 1620. Joshua Lamancusa ("Lamancusa") has held the office of Lawrence County District Attorney since

January 2010. (Lamancusa Dep. 7.)[1] A total of 23 individuals work for Lamancusa. (Lamancusa Dep. 58.)

The County maintains "the official personnel files pertaining to hiring, discipline, terminations and union contracts on all of its employees within the Human Resources Department. Records held by elected Officials and Department Heads are not part of the official personnel record." (Employee Handbook at LC-Wiley-74.)[2] Further, the County has articulated a policy of discipline that "strives for fair and consistent discipline for unsatisfactory conduct" and that it can be applied "at its discretion." (Id. at LC-Wiley-110.) The policy goes on to state that "discipline of employees who work under the supervision of the … Row Officers is at the discretion of the … Row Officer and this progressive discipline policy need not be applied." (Id.)

During Wiley's employment, the District Attorney's Office did not promulgate or maintain its own disciplinary policy separate and apart from that of the County. (Lamancusa Dep. 56.) Instead, Lamancusa said that, as a Row Officer, he could adhere or deviate from the County's policy regarding discipline at his discretion. (Id. at 51-52.)

Lamancusa wanted to be "consistent" and "decisive" when it came to discipline. (Id. at 53.) Lamancusa claimed that he never had to discipline another employee beyond a "talking to" that he could recall. (Id. at 54.) However, as explained below, he did ask Detective Andrew Petyak to resign. (Id. at 88.) Lamancusa further said that his office did not conduct formal performance evaluations for detectives because "[i]t's not something we have done. Any type of corrective action was usually taken directly with the detective or discussed." (Id. at 57.)

Employed within the District Attorney's Office are County Detectives, including the County Humane Officer, and approximately seven prosecutors, also known as Assistant District

[1] Def.'s App. (ECF No. 22) Ex. D.
[2] Pl.'s App. (ECF No. 24) Ex. C.

Attorneys, all of whom are overseen by Lamancusa. (Lamancusa Dep. 10.) Plaintiff was employed as the County Humane Officer from June 2013 through January 2017. (Wiley Dep. 14;[3] Wiley Dep. Ex. C at LC-Wiley-37.[4]) The County Humane Officer investigates reports of animal abuse, neglect and/or cruelty and is responsible for the issuance of animal licenses, warnings and citations for failure to comply with applicable law and prosecution of animal cruelty cases. (Lamancusa Dep. 11-12; Wiley Dep. 25-26; Wiley Dep. Ex. F at LC-Wiley-48, Def.'s 2nd Supp. Disclosures at LC-Wiley-58.[5])

The Humane Officer is under the umbrella of employees known as the County Detectives, who all work in, and are overseen by, the Office of the District Attorney. (Lamancusa Dep. 10.) In 2013, a vacancy existed for the Humane Officer position. (Lamancusa Dep. 10.) Lamancusa interviewed Plaintiff in June 2013 and selected her to fill the position. (Lamancusa Dep. 18-19; Wiley Dep. 16-18, 24.)

Plaintiff had no prior work experience in a law enforcement position, but had a particular interest in working with animals. (Lamancusa Dep. 18-19; Wiley Dep. 10, 13, 18-23; Wiley Dep. Ex. D.)[6] In 2003, Plaintiff had taken on-line course work to become a veterinary technician and, by her own acknowledgment, she wanted to work with animals when she applied for the Humane Officer position. (Wiley Dep. 10, 13; Wiley Dep. Ex. B.)

Plaintiff described herself, in her deposition, as having a passion for animals. (Wiley Dep. 13.) Jerry McCarthy, a male, held the County Humane Officer position prior to Plaintiff's employment, in a part-time capacity. (Wiley Dep. 18, 69.) Plaintiff's employment as Humane

---

[3] ECF No. 22 Ex. B.
[4] ECF No. 22 Ex. C.
[5] ECF No. 22 Ex. C.
[6] Plaintiff graduated from the police academy at Beaver Community College in 2011. (Wiley Dep. 10-13; Wiley Dep. Ex. D.)

Officer/Detective was full-time.  (Wiley Dep. Ex. F at LC-Wiley-000026.)

McCarthy was a part-time County employee and performed job functions similar to those performed by Plaintiff. (Wiley Dep. 18, 69.) Plaintiff had known McCarthy and went on "ride-alongs" with the Shenango Township Police Department upon graduating from the Police Academy in or around 2011. (Wiley Dep. 12-13.)  Plaintiff had told McCarthy about her passion for animals in or around 2011 and he had encouraged her to seek a Humane Officer position with the Lawrence County District Attorney's Office because he thought he could use assistance. (Wiley Dep. 12-13.)

Plaintiff emailed Lamancusa in December 2011 to express her interest in working with/assisting Detective McCarthy as Humane Officer. (Wiley Dep. 9-10; Wiley Dep. Ex. A at LC-Wiley-55.)  While working in a separate law enforcement position for Shenango Township, Officer McCarthy was killed in the line in duty in 2013 after having been struck by a vehicle. (Wiley Dep. Ex. B at LC-Wiley-49.)

Lamancusa contacted Wiley in June 2013, after McCarthy had passed away, and he interviewed her for a full-time Humane Officer position. (Wiley Dep. 14-16.)  The circumstances of Plaintiff's hiring were unique because it is not typical for a person to be hired as a County Detective with no prior law enforcement work history. (Lamancusa Dep. 18-19; Wiley Dep. Ex. B.) A July 2013 article in the New Castle News noted Plaintiff's interest in animals and Lamancusa's desire to fill the position with a person holding such an interest. (Wiley Dep. Ex. B; Wiley Dep. 10-13.)

According to Plaintiff, approximately eighty-five percent (85%) of her work as Humane Officer/Detective were animal or "humane" cases, with the other fifteen (15%) spent on miscellaneous other work such as bad check cases and precious metal transaction monitoring.

(Wiley Dep. 26-27.) The Humane Officer is not responsible for picking up stray animals, as that responsibility lies with a Dog Warden assigned to Lawrence County by the Commonwealth. (Wiley Dep. 27-29; Wiley Dep. Ex. F at LC-Wiley-48; Martwinski Dep. 36-37.[7])

The Humane Officer is periodically called to raids conducted by the local Drug Task Force to remove animals that are sometimes present in homes that are raided. (Lamancusa Dep. 13, 39-40.) The Drug Task Force is composed of specially trained County Detectives and police officers from nearby jurisdictions, such as the City of New Castle Police who are assigned to the task force. (Lamancusa Dep. 88-90, 109-10; Martwinski Dep. 12.) The Humane Officer is not part of the Drug Task Force. (Lamancusa Dep. 16.)

When Lamancusa first hired Plaintiff, the Chief Detective, Andrew Petyak, was Plaintiff's direct supervisor. (Wiley Dep. 35-36.) Petyak had served with the United States Drug Enforcement Agency (DEA) for 24 years before retiring and being hired by Lawrence County as a County Detective and supervisor of a reorganized drug taskforce. (Petyak Decl. ¶¶ 1-3.)[8] Lamancusa hired Petyak in January 2011. (Lamancusa Decl. ¶ 5.)[9]

Petyak was Plaintiff's direct supervisor until December 31, 2013. (ECF No. 24-4 ¶ 4.)[10] At Lamancusa's request, Petyak resigned in late 2013,[11] and, thereafter, Lamancusa became

---

[7] ECF No. 22 Ex. F.
[8] ECF No. 31-1.
[9] Def.'s Motion to Strike (ECF No. 28) Ex. B.
[10] In its reply, Defendant contends that Petyak's last day on the job was October 21, 2013 (ECF No. 30 ¶ 195) (citing Lamancusa Decl. ¶¶ 11-12). Defendant also cites Lamancusa's deposition, but he never identified Petyak's last day; indeed he testified that Petyak worked for him for "a little over four years" (Lamancusa Dep. 88), which cannot be correct. However, in its Concise Statement of Material Facts, Defendant indicated that Petyak resigned "in late 2013" and its own response to Plaintiff's interrogatory states that Petyak was her supervisor until December 31, 2013. Given that there is a discrepancy within Defendant's own evidence, the Court will use the date cited by Plaintiff, drawing all inferences in her favor as the non-moving party.
[11] The parties debate why Lamancusa asked Petyak to resign, but they have not explained why this dispute is material to the facts of this case.

Plaintiff's direct supervisor through mid-2016. (Lamancusa Dep. 92; Wiley Dep. 35-36.)

In mid-2016, Lamancusa appointed Detective Vince Martwinski as the Criminal Investigations Division ("CID") Director. (Lamancusa Dep. 72-74.) As the CID Director, Martwinski supervised all County Detectives that were not assigned to the Drug Task Force, including Wiley, the Humane Officer. (Lamancusa Dep. 9-10, 30-31, 72-74; Wiley Dep. 30, 34-36, 46-47.)[12]

When Martwinski became the CID Director in mid-2016, he became Plaintiff's midlevel supervisor because the Humane Officer is not assigned to the Drug Task Force. (Lamancusa Dep. 9-10, 30-31, 72-74; Wiley Dep. 30, 34-36, 46-47; Martwinski Dep. 31-32.[13])

Approximately three and one-half years after Lamancusa hired Plaintiff, he terminated her employment on January 5, 2017. (Lamancusa Dep. 18, 23.) He states that his reason was chronic problems with how she interacted with members of the public, prosecutors within his office, and local law enforcement. He states that the overarching problem was that Plaintiff alienated members of the community, prosecutors and local police, and was overly focused on affording an "authoritarian presence" rather than serving the public and working cooperatively with prosecutors and local police. (Lamancusa Dep. 17-18.) Plaintiff disputes this assertion.

<u>Plaintiff's Interactions with Prosecutors</u>

Lamancusa oversees seven (7) Assistant District Attorneys who prosecute cases. (Lamancusa Dep. 10; Wiley Dep. 70.) As a Humane Officer/Detective, Plaintiff worked on cases primarily with two Assistant District Attorneys: Luanne Parkonen and Jessica Sullivan. (Lamancusa Dep. 10; Wiley Dep. 70.) Plaintiff states that she worked with Sullivan, Jonathan

---

[12] Defendant's response to Plaintiff's interrogatory lists the date as "mid-2014" (ECF No. 24-4 ¶ 4). This would appear to be a typographical error.
[13] Defendant notes that Martwinski was not formally appointed (for union purposes) as Wiley's supervisor until around the time of her discharge in January 2017. (Martwinski Dep. 31.)

Miller and Deanne Emerich on animal cases and Parkonen on other cases, such as bad checks. (Wiley Decl. ¶ 1.)[14] Lamancusa stated that the Assistant District Attorneys make certain prosecutorial decisions, which Plaintiff often disagreed with in a way that showed a lack of understanding of her role as a detective in relation to the role of the prosecutor. (Lamancusa Dep. 21.) Plaintiff states that she did not disagree with prosecutorial decisions, that she understood that they were lawyers and respected their knowledge, experience and skills, and that she occasionally asked questions because she was curious about how the law works. She also denies that Lamancusa ever counseled her about her dealings with ADAs. (Wiley Decl. ¶ 2; Wiley Dep. 70-71.)

In one particular case, Assistant District Attorney Luanne Parkonen told Plaintiff that a particular defendant could not be prosecuted by Lawrence County because they had already been charged for the same offense by a different Humane Officer serving the Ellwood City and Wayne Township area, i.e., double jeopardy. (Lamancusa Dep. 20-22; Martwinski Dep. 41-43.) Plaintiff did not accept Parkonen's determination, and she sought a different answer from other ADAs and also talked to Martwinski about the matter. (Lamancusa Dep. 20-21; Martwinski Dep. 42-45.) Plaintiff did not like Parkonen's answer that the Defendant could not be charged separately by Lawrence County and went to Martwinski about the matter, as well as the First Assistant District Attorney (Deputy), Diane Shaffer. (Martwinski Dep. 43-44.)

Plaintiff responds that the case at issue was a case being prosecuted by Diane Shaffer, not Luanne Parkonen. She indicates that she did not challenge ADA Shaffer's decision regarding this case; she just asked her a question of why double jeopardy applied to the charges as they were filed. Shaffer explained it to Wiley and Wiley was satisfied with the answer. Wiley did not run

---

[14] ECF No. 24 Ex. A.

around to other ADAs looking for a different answer or trying to go around ADA Shaffer's decision. (Wiley Decl. ¶ 3.)

First Assistant District Attorney Diane Shaffer also told Plaintiff that the person could not be charged again for the same offense, and because Plaintiff again did not like the answer, she went to a newly hired Assistant District Attorney, Deanne Emerich. (Martwinski Dep. 43-45.) Assistant District Attorney Deanne Emerich brought the matter to the attention of Diane Shaffer, who was not happy that Plaintiff did not accept the answer that had already been provided. (Martwinski Dep. 43-44.) Diane Shaffer complained to Martwinski about the matter, and Martwinski had a conversation with Plaintiff and told her that she should not be going to multiple prosecutors because she does not like their answers. (Martwinski Dep. 43-44.) When Martwinski talked with Plaintiff about the matter, she argued back and forth with him that double jeopardy did not apply. (Martwinski Dep. 44.) Martwinski explained to Plaintiff that she does not have a law degree, as do the prosecutors, and that three prosecutors provided her with the same answer and that she needed to "stop and let it go." (Martwinski Dep. 44.) Martwinski testified in this regard that there were times when Plaintiff did not like an answer she received and she would "look for another answer from somebody else, it didn't matter who it was…" (Martwinski Dep. 45.)

Martwinski brought the above-described issue to Lamancusa's attention, and Lamancusa recalls that Plaintiff ultimately questioned him about why double jeopardy applied. (Martwinski Dep. 44-45; Lamancusa Dep. 20-21.) Lamancusa provided Plaintiff with the same answer that she had received from the prosecutors whom she had questioned, i.e., the individual could not be charged a second time for the same offense. (Lamancusa Dep. 20-21.) Lamancusa described this as Plaintiff "always searching for the answer that she wanted versus what the answer actually

was, what the law actually was." (Lamancusa Dep. 19-20.) Similarly, Plaintiff was unhappy when the Assistant District Attorneys chose to lessen charges or sentences, although it is not a detective's role to make those type of prosecutorial decisions. (Lamancusa Dep. 21, 26.) Lamancusa was aware of the difficulty Plaintiff had in recognizing the role of the prosecutors because the Assistant District Attorneys would periodically raise their frustrations over this problem in weekly and monthly meetings that he holds with his prosecutors. (Lamancusa Dep. 23-26.) According to Lamancusa, the problem of Plaintiff not properly acknowledging the role of the prosecutors, and not responding well to direction when it ran contrary to her own opinions, manifested itself in small situations at the beginning of her employment, but became worse and not better as time went on. (Lamancusa Dep. 23, 38.)

Plaintiff responds that the case came up in a conversation she had with Martwinski, that she simply told him she had a question about why double jeopardy applied and that ADA Shaffer explained it. She did not tell Martwinski that she had gone to other prosecutors about it and he did not tell her that he had heard that she did. It was just a regular conversation that came up during the course of business one day. (Wiley Decl. ¶ 4.) She also indicates that Lamancusa brought the issue up, not in the context of any discipline, but to explain why double jeopardy applied and to give Wiley advice on how to file charges to avoid the problem occurring again. (Wiley Decl. ¶ 5.) Plaintiff was not typically involved with a case if it was pending in the Court of Common Pleas so she usually was unaware of what happened with it after she gave the file to the ADA. She was not typically aware if charges got reduced or plea agreements for a lower sentence were entered into. (Wiley Decl. ¶ 6.) There was only one case where Wiley ever raised a question about why a charge had been reduced. It involved a particularly brutal killing of a dog by its owner. Wiley heard that the charge had been reduced from a misdemeanor to a summary

offense and she asked Jessica Sullivan about what happened with the case. She did not challenge her decision regarding the disposition of the case. (Wiley Decl. ¶ 7.)

Andrew Petyak states that he had the opportunity to watch and observe her perform as the Detective/Humane Officer for Lawrence County prior to his resignation. She seemed genuinely interested in her job, she took it seriously and, from what Petyak observed, was doing a good job despite her lack of law enforcement experience. From time to time, she would ask him questions, seek advice and look for guidance. (Petyak Decl. ¶ 25.) Based on Petyak's observations, she was effective at her job. She handled the public and witnesses well. Petyak never heard that members of the public, other police officers or witnesses had any problems with how she performed or how she interacted with them. She handled herself professionally and responsibly. (Id. ¶ 26.)[15]

### Plaintiff's Problems Serving and Interacting with the Public

Defendant states that another significant area in which Plaintiff was unable to meet Lamancusa's reasonable expectations of an employee representing his Office involved her interactions with, and responses to, citizens who would contact her with inquiries about the status or welfare of a particular animal. (Lamancusa Dep. 28-29; Martwinski Dep. 38-41.) Plaintiff would not provide any information to such callers, even though there is almost never a reason to not provide such information in an animal welfare case. (Lamancusa Dep. 29-30.) Plaintiff responds that she did respond to the numerous calls she received regarding information requests from the public regarding animals and that Martwinski told her to tell the callers that the matter is a subject of an investigation and that she was not able to provide information regarding that investigation. (Wiley Dep. 79.)

_____

[15] Defendant moves to strike Petyak's statements, contending that his opinion of Wiley's performance in 2013 is irrelevant to her termination in 2017. However, as Plaintiff observes, Lamancusa has asserted that she had problems from her first day on the job, and therefore Petyak's observations about her during that time period are relevant.

According to Lamancusa, Plaintiff's general attitude toward the public when she received such inquiries was: "I don't need to tell you" and "I'm a detective. This is an investigation. I don't give answers to you." (Lamancusa Dep. 28-29.) Plaintiff responds that she met with Lamancusa infrequently during her employment. (Wiley Dep. 36.) She was not told that her interaction with the public was an issue or that she should be more responsive to their concerns. (Id. at 78-79.) She recalled only two isolated incidents when Lamancusa told her to "work on her people skills" which involved innocuous events that amounted to nothing. (Id. at 79-81.) In fact, after one such incident, Lamancusa called Wiley back and said "Don't worry about it, everything is good." (Id. at 82.)

Martwinski's desk was near Plaintiff's desk, and he would overhear Plaintiff telling individuals who were calling about an animal that she does not give out information or return phone calls. (Martwinski Dep. 38-39.)

The Lawrence County District Attorney's Office has an animal hotline (Lamancusa Dep. 28-29; Martwinski Dep. 40), and Martwinski was aware that Lamancusa received complaints by the public about Plaintiff's attitude and unwillingness to provide information. (Martwinski Dep. 38-39.) Plaintiff responds that no such concerns were brought to her attention. (Wiley Dep. 78-79.) The animal community is passionate and Plaintiff's unwillingness to respond to citizen inquiries was a significant problem. (Lamancusa Dep. 29-33; Wiley Dep. 78.) Lamancusa counseled Plaintiff that there was no reason to refuse such inquiries and that she should provide information about the welfare of particular animals. (Lamancusa Dep. 29-33.) Plaintiff would acknowledge Lamancusa's instruction, but then would continue to rebuff the inquiries nonetheless, creating a problem that repeated itself over and over. (Lamancusa Dep. 33.) Plaintiff testified that Martwinski told her not to give out information about a matter that is

under investigation, and that he instructed her to tell people that she could not call them back. (Wiley Dep. 78.) According to Lamancusa, Plaintiff generally was not receptive to training and the habitual problem with her demeanor toward the public was unique to her and not exhibited by other detectives employed in the District Attorney's Office. (Lamancusa Dep. 36-38.) Plaintiff wrote a post-termination grievance, in which she acknowledged that Lamancusa and she were "discussing complaints" in late 2016 and he asked her to improve her "people skills." (Wiley Dep. Ex. H at LC-Wiley-14.)

<u>Plaintiff's Interactions with Local Law Enforcement Officers</u>

According to Lamancusa, Plaintiff exhibited poor judgment in her interactions with other law enforcement officers. (Lamancusa Dep. 38-44.) Lamancusa observed that Plaintiff perceived herself as holding a position above local police officers from nearby jurisdictions because she was a County Detective, rather than a city, borough or township police officer. (Lamancusa Dep. 38-44.) In doing so, Plaintiff failed to consider the experience or rank of these other local law enforcement officers. (Lamancusa Dep. 38-44.)

The District Attorney's Office maintains a Drug Task Force that works in conjunction with the City of New Castle police. (Lamancusa Dep. 9, 87-90.) According to Lamancusa, Plaintiff was disrespectful to the City of New Castle Chief of Police, Robert Salem, in public and outside the scene of a drug raid. (Lamancusa Dep. 40-43.) Lamancusa was present during this incident and he recalled Plaintiff either yelling at Chief Salem or instructing him to do something in a disrespectful fashion. (Lamancusa Dep. 41-42.) At the time of this incident, Lamancusa attributed Plaintiff's inappropriate conduct toward Chief Salem to a lack of experience, and he addressed the inappropriateness of her conduct with her on the spot. (Lamancusa Dep. 41-43.)

Plaintiff responds that she was never disrespectful to Chief Robert Salem. She liked him

a lot and respected him. She always got along with him and he always showed her professional courtesy. (Wiley Decl. ¶ 8.) Moreover, Lamancusa never told her that she had acted in a disrespectful or belligerent way to Chief Salem. He never brought up any incident that dealt with such an issue. (Id. ¶ 9.)

Another incident involved drug task force officers and also occurred early in Plaintiff's employment. (Lamancusa Dep. 39-40.) Drug Task Force officers were preparing to enter a residence in an organized "stack" formation with fully automatic assault rifles and body armor. (Lamancusa Dep. 39-40.) As the raid was about to occur, Plaintiff tapped the lead officer on the shoulder and told him that she would be behind him in the "stack" formation. (Lamancusa Dep. 39-40.)

The drug task force officer told Plaintiff that she would not be in the stack formation and that she would be called when needed to address any animal concerns. (Lamancusa Dep. 39-40.) At the time of this incident, Lamancusa also attributed this "bold" judgment of Plaintiff to a lack of experience. (Lamancusa Dep. 39-40.) Plaintiff's desire to assert herself as having higher authority (as a County Detective) over other local law enforcement officers never improved and it interfered with her ability to satisfactorily perform her position. (Lamancusa Dep. 43-44.)

Plaintiff responds that, although she was, from time to time, assigned to go to some drug raids, it was always in her capacity as a humane officer. In other words, her presence at any drug raid was to handle any animal issue that may arise, not to participate in the raid itself. Wiley knew that she did not have the training to participate in a drug raid with the task force. They wore body armor and had suitable weapons. She always stayed in the back, where she was deployed; She never said that she would be right behind the officers in the "stack." (Wiley Decl.

¶¶ 10, 11.)

Defendant states that another example of this problem involved how Plaintiff responded to calls when dispatched over the radio by a County dispatcher. (Lamancusa Dep. 44-45; Martwinski 34-35.) A City of New Castle police officer would call over the radio for Plaintiff to be dispatched to a location regarding an animal. Plaintiff would respond by first wanting to know what the call "was about" as a condition to responding to the call. (Lamancusa Dep. 45.) Lamancusa also recalled an instance where Plaintiff stated over the radio to a dispatcher that she would only respond to a call if the New Castle City police remained at the location. (Lamancusa Dep. 45-46; Martwinski Dep. 35-36.) Martwinski heard the call himself; he recalled that when Plaintiff stated over the radio that she would not respond to the call unless the New Castle police remained at the location, the New Castle officer cancelled the call and instructed the dispatcher "tell her disregard, I don't need her assistance." (Martwinski Dep. 34-35.) These type of responses by Plaintiff over the radio were contrary to protocol because law enforcement officers are not expected to debate with the dispatcher about whether a call merits their attention. (Lamancusa Dep. 45; Martwinski Dep. 37-38.)

Plaintiff responds that there were a couple of occasions involving her interactions with New Castle police officers that were brought to her attention and, again, they were minor isolated incidents. (Wiley Dep. 91-94.)

Martwinski described these incidents as Plaintiff giving "ultimatums" as to how she was going to assist other agencies. (Martwinski Dep. 34-35.) Martwinski testified that the County Detectives are supposed to assist other agencies and that Plaintiff opted not to do so on more than one occasion. (Martwinski Dep. 35.) Police officers from other local agencies would complain to Martwinski about this problem and he discussed the problem with Plaintiff, but the

problem never stopped or changed. (Martwinski Dep. 34-37.) When Martwinski discussed the problem with Plaintiff, she would complain that local police officers expect her to pick up stray animals, which is in the realm of the work performed by the Dog Warden appointed by the Commonwealth. (Martwinski Dep. 34-37.) Martwinski agreed that the Humane Officer was not responsible for picking up stray animals. (Martwinski Dep. 36-37.) The County replaced the "Humane" logo on the truck Plaintiff drove, and replaced it with the "County Detective" logo, in order to avoid confusion over work performed by the Commonwealth appointed Dog Warden versus work performed by the County Humane Officer/Detective. (Martwinski Dep. 79-80.)

According to Martwinski, Plaintiff was confrontational with local police officers because they asked her to address stray animals and she would "brag" to Martwinski about being confrontational over the radio when dispatched. (Martwinski Dep. 34-38.) Martwinski recalled Plaintiff coming into the office on one occasion and bragging because she had told the dispatcher that she was not going to respond to the call unless the City of New Castle police officer remained at the location, and Martwinski responded by telling Plaintiff, "you should have never done that, never. You don't have a third party, you know, relay your message. You should have called the officer yourself to talk to him." (Martwinski Dep. 37-38.) Martwinski testified that Plaintiff's ultimatum to the dispatcher was improper because a dispatcher cannot give an order to a police officer. (Martwinski Dep. 38.)

This particular problem with respect to responding to calls over the radio was brought to Lamancusa's attention on several different occasions, and Plaintiff acknowledged that Lamancusa spoke to her about it at least once. (Lamancusa Dep. 45; Wiley Dep. 93-94.) Lamancusa also recalled that at the beginning of Plaintiff's employment, she spent more time in the field, such as canvassing for animal licensing and animal neglect/abuse issues, but over time

and the longer she remained in the position, the less she would leave the office. (Lamancusa Dep. 46-47.)

<u>Lamancusa's Counseling of Plaintiff</u>

Lamancusa was aware that Plaintiff had no prior law enforcement experience when he hired her. He allowed time, as well as training, so that she could acclimate to a position involving serving the public as a representative of the District Attorney's Office. (Lamancusa Dep. 18-19.)

According to him, the problems with how Plaintiff interacted with members of the public, prosecutors and local law enforcement were evident from the beginning of her employment, but became more, and not less, prevalent over time. (Lamancusa Dep. 18-19.) Lamancusa initially believed that the problems would be corrected with on-the-job experience, but that improvement never occurred. (Lamancusa Dep. 19.) Lamancusa had many meetings and conversations with Plaintiff over the approximate three years of her employment regarding these issues, but the problems never subsided. (Lamancusa Dep. 18-19, 23, 26-27, 54.) Lamancusa cannot recall any other instance when he had to discipline an employee. (Lamancusa Dep. 50.)

Plaintiff testified that she recalled meeting with Lamancusa approximately once per month and she recalled a couple of discussions regarding her "people skills." (Wiley Dep. 36-37, 79-87, 83-84.) Plaintiff recalled one conversation Lamancusa had with her about her "people skills" where she recalled Lamancusa asking "if I listened to myself", and telling her to "talk to people and listen to my voice and my tone." (Wiley Dep. 83-84.) Plaintiff testified that she was very conscious of how she talked to people because Lamancusa asked her to be conscious of the same. (Wiley Dep. 84.)

Martwinski was aware that Lamancusa was receiving complaints about Plaintiff. (Martwinski Dep. 40.) Martwinski had conversations with Plaintiff about how she interacted

with others, in order to give her advice. (Martwinski Dep. 38-41.) Martwinski and Lamancusa also discussed complaints Lamancusa had received about Plaintiff, and sometimes Lamancusa and Martwinski would realize that they both had talked with Plaintiff about the same issue involving how she was interacting with the public. (Martwinski Dep. 40-41.) Plaintiff testified that she has never had anyone else tell her to "work on her people skills." (Wiley Dep. 83-84.)

The discipline that Lamancusa "exhibited" on Wiley "was progressive verbal discipline for numerous years, ultimately, culminating her termination." (Lamancusa Dep. 54-55.) On this point, when asked if he ever escalated the level of counseling beyond verbal to make Wiley aware of her lack of improvement, Lamancusa said that he did not give her written warnings or anything like that, but instead, he decided to interact with her less frequently. (Id. at 28.) Wiley believed that she was performing adequately, if not well, at her job and was surprised when she was called into a meeting with Lamancusa on January 5, 2017 and told that she was being terminated because she had allegedly been rude to a priest's parishioner. (Wiley Dep. 85.)[16]

After the fact, Lamancusa summarized his reasoning for her termination as follows: it was because of her "failure to understand that being a detective means that you are community service face [sic] of the District Attorney's Office. And her inability, her insecurity, her desire to be an authoritarian presence really alienated members of the community that included the general population, my prosecutors and other police departments." (Lamancusa Dep. 18.) Defendant responds that Lamancusa listed other issues as well.

Lamancusa's Decision to Terminate Plaintiff's Employment

Lamancusa states that his decision to terminate Plaintiff's employment in January 2017

---

[16] Defendant objects to Plaintiff's subjective belief as to her own performance as irrelevant. However, her surprise as to being terminated without warning is relevant to the issue of pretext.

was the culmination of years of the above-described problems which went uncorrected. (Lamancusa Dep. 48.) Lamancusa did not want Plaintiff to fail in her position and she performed the job well with respect to working with animals, such as relocating animals. (Lamancusa Dep. 48-49.) However, the issues with respect to working with other individuals and the community never improved and Plaintiff was unable to implement Lamancusa's instruction and counseling regarding how to interact with the public, prosecutors and other law enforcement officers. (Lamancusa Dep. 26-28.)

One precipitating event that led to Lamancusa's decision to terminate Plaintiff's employment on January 5, 2017 involved a complaint by a priest on behalf of a resident who lived on the south side of New Castle who had tried to speak with Plaintiff about an animal concern. (Lamancusa Dep. 48; Wiley Dep. 84-86; Martwinski Dep. 45-46.) Plaintiff was rude and argumentative with the resident, and the priest's complaint confirmed to Lamancusa that Plaintiff was unable to adapt, learn and change her demeanor toward the general public, and that he could no longer continue to employ her as the Humane Officer. (Lamancusa Dep. 48; Wiley Dep. 84-86.) Lamancusa exercised his discretion as an elected County Row Officer to terminate Plaintiff's employment after years of counseling her on the problems at issue, without formal, written progressive discipline. (Lamancusa Dep. 50-54.) Plaintiff notes that there is no written documentation corroborating any discipline issues involving her and that Lamancusa did not utilize formal, written progressive discipline.

Plaintiff responds that Lamancusa refused to give her any details regarding her allegedly rude behavior, or even identify the person to whom she had been rude, saying that the details "were not important." He then said "I can't have that kind of behavior" and that he had "several discussions about [Wiley's] people skills" in the past. Wiley said "No, we didn't" and he

responded, "Well, I can't have that in my office." (Wiley Dep. 84-85.) Plaintiff notes that Lamancusa did not address or bring up any of the other alleged issues that he claims formed a basis for his decision.

Lamancusa met with Plaintiff on January 5, 2017 and informed her that he could not continue her employment. (Wiley Dep. 98-99.) Plaintiff acknowledged in a post-termination grievance that she wrote that Lamancusa told her about the complaint by the priest at the January 5, 2017 meeting. (Wiley Dep. Ex. H at LC-Wiley-15.) In Plaintiff's post-termination grievance, she stated in reference to the January 5, 2017 meeting and the complaint by the priest: "I told [Lamancusa] that it didn't happen and that my conversations have been all pleasant. I asked him 'what if it is a lie.'" (Wiley Dep. Ex. H at LC-Wiley-16.) Martwinski also recalls Lamancusa telling Plaintiff about the complaint by the priest at the January 5, 2017 meeting, which Plaintiff did not believe. (Martwinski Dep. 67-68.)

According to Plaintiff, Lamancusa told her at the January 5, 2017 meeting that he had "told her enough times to work on my people skills, and although my work was very good, my attitude was not." (Wiley Dep. 84.) Lamancusa told her at the meeting, in reference to the complaint by the priest, that "I can't have that kind of behavior" and "I can't have that in my office." (Wiley Dep. 85.) According to Plaintiff, Lamancusa told her at the meeting that "we have had several discussions about your people skills" and Plaintiff responded, "No, we didn't." (Wiley Dep. 85.) Plaintiff also acknowledged in the post-termination grievance she prepared that Lamancusa told her that she was not responding to calls by the City of New Castle Police, which Plaintiff said was "not true" in her written grievance. (Wiley Dep. Ex. H at LC-Wiley-15.)

Lamancusa provided Plaintiff with the option to resign and collect pay for thirty days, which Plaintiff declined. (Wiley Dep. 98-105.) Lamancusa was cordial and displayed no

animosity toward Plaintiff, and offered to write her a letter of recommendation. (Martwinski Dep. 65; Wiley Dep. 65.) Present during the January 5, 2017 meeting were Martwinski and Human Resources Director Karen King. (Wiley Dep. 116-117.) Lamancusa made the decision to terminate Plaintiff's employment. (Martwinski Dep. 63; Lamancusa Dep. 17-18.)

Martwinski had no role in Lamancusa's decision-making regarding the termination of Plaintiff's employment. (Martwinski Dep. 63-64.) Martwinski was unaware of Lamancusa's decision to terminate Plaintiff's employment until about five minutes prior to attending the January 5, 2017 meeting. (Martwinski Dep. 63-65.) Lamancusa did not ask Martwinski for his opinion on whether Plaintiff's employment should be terminated. (Martwinski Dep. 64.) Martwinski believed he was called to be present during the meeting because he was Plaintiff's direct supervisor at the time and could serve as a witness during the meeting. (Martwinski Dep. 68-69.)

<u>Post-Termination Grievance</u>

Plaintiff submitted a four-page handwritten grievance dated January 6, 2017. (Wiley Dep. Ex. H at LC-Wiley-14-17.) While Plaintiff explained in her grievance why she disagreed with the decision to terminate her employment, she did not allege any discriminatory treatment. (<u>Id.</u>) When Plaintiff was hired, she signed an acknowledgment form for the County's Ordinance prohibiting discrimination and harassment in the workplace, as well as prohibiting retaliation for reporting discrimination or harassment. (Wiley Dep. 37-38; Wiley Dep. Ex. G at LC-Wiley-35.) Plaintiff never made any complaint to the County's Human Resource's Office about discriminatory or inappropriate treatment. (Wiley Dep. 65.) Plaintiff responds that she never raised these issues with Lamancusa because she was afraid of losing her job. (<u>Id.</u>)

Plaintiff's Union sent her a letter dated January 12, 2017, in which the Union

acknowledged the District Attorney's authority to make hiring and termination decisions for personnel in the District Attorney's Office, pursuant to the Pennsylvania Constitution and Section 1620 of the Pennsylvania County Code. (Wiley Dep. Ex. M at LC-Wiley-12.)

Plaintiff testified that she told Detective Martwinski that she felt she was treated differently as a woman. (Wiley Dep. 37-38, 46.) Plaintiff could not recall specifically when she made that statement to Martwinski, but she may have talked with him about it in 2015 and 2016. (Wiley Dep. 37-38, 46-47.) Martwinski testified that Plaintiff never complained to him about how Lamancusa treated her, nor did she bring any issues to his attention related to the same. (Martwinski Dep. 33.)

### Plaintiff's Replacement After Termination

Lamancusa hired Matthew Venasco to fill the position left vacant when he terminated Plaintiff's employment. (Lamancusa Dep. 108.) Venasco worked for the Lawrence County Sheriff's Office and had approximately eight (8) years of law enforcement work experience when Lamancusa hired him. (Lamancusa Dep. 108.)

### Procedural History

On or about May 16, 2017, the Equal Employment Opportunity Commission ("EEOC") forwarded Charge No. 533-2017-00691 filed by Plaintiff, which alleged sex discrimination and hostile work environment. (ECF No. 1 ¶ 2.) The EEOC issued a Dismissal and Notice of Rights regarding Charge No. 533-2017-000691 on August 31, 2017. (ECF No. 1 ¶ 4.) Plaintiff filed this action on September 18, 2017. Count I alleges gender discrimination and hostile work environment under Title VII, and Count II makes the same allegations under the Pennsylvania Human Relations Act, 42 P.S. §§ 951-55 (PHRA). (ECF No. 1.) At the close of discovery, Plaintiff stipulated to proceed solely with her claims of unlawful gender discrimination and to

withdraw the claims of hostile work environment/sexual harassment.  (ECF No. 22 Ex. A.)

On October 31, 2018, Defendant filed a motion for summary judgment (ECF No. 19).

On November 30, 2018, Plaintiff filed a brief in opposition (ECF No. 25) and on December 28, 2018, Defendant filed a reply brief (ECF No. 29).  Also, on December 28, 2018, Defendant filed a motion to strike the declaration of Andrew J. Petyak, Jr. (ECF No. 28).  On January 17, 2019, Plaintiff filed a brief in opposition to this motion (ECF No. 31).  The Court will first address the motion to strike and then the motion for summary judgment.

Motion to Strike

In the Appendix to Plaintiff's Response to Defendant's Concise Statement of Material Facts is a Declaration of Andrew J. Petyak, Jr. (ECF No. 24 Ex. B).[17]  Defendant moves to strike or disregard certain paragraphs of Petyak's declaration[18] on the following grounds: 1) it was not sworn under penalty of perjury; 2) it is based almost entirely on vague, conclusory opinions about former City of New Castle narcotics officers, former and current Lawrence County detectives and D.A. Lamancusa; 3) Petyak's opinions regarding certain City of New Castle and Lawrence County narcotics officers are almost entirely based on hearsay statements of unnamed confidential informants who have not been identified during discovery in this case; 4) some of Petyak's accusation concern a particular former City of New Castle police officer and former Lawrence County detective, Christian Hauser, who also was never identified during discovery in this case and has not been named as a witness; 5) Petyak's declaration is based on vague

---

[17] Plaintiff indicates that she listed Petyak as a potential witness in her answers to Defendant's interrogatories (ECF No. 24-5 ¶ 2) and that she produced a copy of a text message in which Petyak directly referred to Martwinski making "dumb blonde jokes" and Lamancusa asked Petyak if he had made a mistake hiring a female, and Defendant does not contend otherwise. Despite this information, Defendant opted not to take Petyak's deposition.

[18] Defendant's motion is somewhat unclear, in that the wherefore clause specifically requests that the Court strike paragraphs 6-9 and 13-29, but in the body of the motion it also requests that the Court strike paragraphs 10 and 12.

assertions for which he has no personal knowledge and for which he is thus incompetent to testify; and 6) Petyak fails to provide any dates throughout his declaration and has no personal knowledge relevant to the termination of Plaintiff's employment because he resigned three years prior to her termination.

Plaintiff responds that: 1) Petyak's declaration substantially comports with the requirements of 28 U.S.C. § 1746 and, in any event, Petyak has signed another identical declaration with the exact language detailed in the statute (ECF No. 31-1); 2) and 3) the information about Vincent Martwinski, Christian Hauser and Quentin Emerich are presented not for the truth of the matters asserted but rather to establish that Petyak notified Lamancusa of his concerns about the behavior of these individuals and Lamancusa dismissed Petyak's concerns and failed to investigate; 4) Plaintiff learned about incidents involving Hauser during a November 2018 interview with Petyak during which Petyak prepared his declaration; 5) Petyak establishes a foundation for his observations about Martwinski, Emerich and Hauser; and 6) Petyak's observations about Plaintiff's performance are not offered to rebut Lamancusa's conclusion about her performance leading up to her termination, but to rebut Lamancusa's contention that she had problems even at the beginning of her employment when Petyak was present.

With respect to Defendant's first argument, the Court need not decide if Petyak's original declaration was insufficient on the basis that it was unworn, because Plaintiff has resubmitted the identical declaration, on which Petyak has stated "I declare under penalty of perjury that the foregoing is true and correct." (ECF No. 31-1 at 8.) This fulfills the requirements of 28 U.S.C. § 1746.

The Federal Rules of Civil Procedure provide that: "An affidavit or declaration used to

support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed.R.Civ.P. 56(c)(4). Defendant contends that Petyak's declaration is not based on personal knowledge, relies on facts that are not admissible in evidence and does not show that he is competent to testify as to the matters stated. Plaintiff rejects these contentions.

Defendant cites Fitzpatrick v. National Mobile Television, 364 F. Supp. 2d 483 (M.D. Pa. 2005). In that case, the plaintiff was fired from his job as a truck driver after having been involved in three preventable accidents over an 8½ month period. Fitzpatrick alleged age discrimination and attempted to proffer evidence that other, younger truck drivers also had accidents but were not terminated, but the court held that the affidavits he submitted to support this claim did not meet the standard required. Specifically, Fitzpatrick proffered the affidavit of fellow truck driver Jim Zap, who said it was "common knowledge" that another truck driver (Sandra McLaughlin) had "been in several accidents." But the court observed that "common knowledge" did not establish Zap's "personal knowledge" and could have been based on hearsay, mere rumor or innuendo. Fitzpatrick also presented his own testimony, which stated that he was told about McLaughlin's accidents by Anthony Cassano, who was responsible for repairing the trucks that McLaughlin damaged. But the court held that Fitzpatrick never established how Cassano knew who was operating which trucks when they were damaged. Id. at 495-96. Defendant also cites Maldonado v. Ramirez, 757 F.2d 48, 51 (3d Cir. 1985), in which the Court of Appeals held that a single affidavit, containing essentially conclusory statements rather than statements of fact was, standing on its own, insufficient to support a motion for summary judgment. Defendant cites Javornick v. United Parcel Service, Inc., 2008 WL 4462280 (W.D. Pa. Sept. 29, 2008), but in that case Judge Lancaster struck affidavits proffered by two

former employees (who had positions equivalent to the plaintiff), who essentially offered their conclusory opinions that the plaintiff should not have been disciplined.

In this case, by contrast, Petyak states that he told Lamancusa that Hauser was goofing off and not performing his job, that Martwinski had anger issues and Emerich was involved in a DUI but did not report to his supervisors or the DEA. In each case, Petyak states that Lamancusa dismissed Petyak's concerns and took no action with respect to these detectives. Petyak can certainly testify as to these incidents from his personal knowledge. Moreover, these incidents are related not for the truth of the matters asserted, but to indicate that Petyak notified Lamancusa about problematic behavior from detectives under his command and that he dismissed Petyak's concerns and took no action. Lamancusa also suggests that Petyak could have disciplined Hauser (Lamancusa Decl. ¶ 17), but Petyak states that he could only recommend discipline which Lamancusa had the responsibility to mete out, but did not. (Petyak Decl. ¶ 18.) The trier of fact will have to hear this competing evidence and determine the credibility of the witnesses.

Petyak also states that Wiley performed her job well during the time that he supervised her. (Petyak Decl. ¶¶ 25-26.) As her supervisor who was actually present (unlike the witnesses in Javornick), he can certainly testify about this matter from his personal knowledge. Defendant contends that this testimony is irrelevant because she was not terminated until two years later and he cannot comment on events that occurred after he left. However, as Plaintiff observes, Lamancusa has testified that Wiley had problems from her first day on the job and Petyak can testify that he does not support this assessment. He can also testify about Lamancusa expressing doubts about having hired a woman for the position, particularly given Defendant's contention that his hiring of Wiley itself undermines her case by making it implausible that Lamancusa "suddenly became adverse [sic] to Plaintiff's gender in January 2017." (ECF No. 20 at 11.)

On the other hand, some of Petyak's declaration is about his raising to Lamancusa of "troublesome activities" involving New Castle police officers who worked with Lawrence County detectives as part of the Lawrence County Drug Task Force, which ultimately led to Lamancusa's request for Petyak's resignation (Petyak Decl. ¶¶ 6-10). As noted above, this information is not relevant to Plaintiff's case and therefore, it will be disregarded. If this case proceeds to trial, Defendant can attempt to impeach Petyak's testimony by questioning him about why he was asked to resign and whether he has any bias against Lamancusa, but such matters cannot be resolved in the context of a motion for summary judgment. Similarly, Petyak discusses a disturbing allegation regarding detective Christian Hauser that he learned about from a confidential informant and conveyed to Lamancusa (Petyak Decl. ¶¶ 13-17).[19] As Defendant indicates, this information does not come from Petyak's personal knowledge, involves hearsay from unknown third parties who were not identified in discovery and contains Petyak's own opinion of how Lamancusa should have handled the situation. These portions of his declaration will not be considered in resolving the pending motion for summary judgment. Therefore, the motion to strike will be granted with respect to paragraphs 6-10 and 13-17 of Petyak's declaration and denied with respect to paragraphs 18-29.

<u>Standard of Review for Summary Judgment</u>

The Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any

---

[19] In addition, in her brief, Plaintiff refers to serious allegations of misconduct made against Lamancusa in another case pending before the undersigned, <u>Taylor F. v. Lawrence County</u>, Civ. A. No. 18-1397 (ECF No. 25 at 13 n.7). That case, which is unrelated to this case, is at the pleading stage and the Court cannot rely upon the allegations asserted therein.

element essential to that party's case, and for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor.  Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

Defendant argues that: 1) Plaintiff cannot maintain a prima facie case of gender discrimination because she has not pointed to similarly situated male detectives who received more favorable treatment and she has not pointed to circumstances that would support an inference of unlawful discrimination; and 2) it has proffered a legitimate, non-discriminatory reason for Plaintiff's termination and she has failed to proffer evidence that this reason is a pretext for unlawful gender discrimination by pointing to male detectives (who did not engage in the same behavior as she did) or by pointing to stray remarks unconnected to her termination.

Plaintiff responds that: 1) she has set forth a prima facie case of discrimination; 2) Lamancusa never documented any problems with Plaintiff's performance over the course of three years and Plaintiff recalls him speaking to her on only two occasions about minor incidents

and he indicated that he decided to "interact with her less frequently" instead of documenting her difficulties or engaging in progressive discipline; and 3) Lamancusa expressed concern that he "made a mistake hiring a female" for the position and treated three male detectives who engaged in far more egregious conduct more favorably, as documented in Petyak's declaration.

In a reply brief, Defendant contends that: 1) Plaintiff relies almost entirely on Petyak's declaration, which should be stricken as unsworn, vague, lacking in personal knowledge and based on hearsay statements from unnamed confidential informants never previously identified; and 2) she claims she did not receive progressive discipline, but there is no requirement of progressive discipline and it is generally not applied to "row officers"; Lamancusa hired Plaintiff in 2013 and fired her in 2017 and stray remarks do not establish pretext; and the three detectives she cites did not engage in comparable behavior.

Gender Discrimination Claims

Title VII provides that "It shall be an unlawful employment practice for an employer to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex…" 42 U.S.C. § 2000e-2(a)(1).  The PHRA similarly prohibits such discrimination.  43 P.S. § 955(a).  Defendant argues that Plaintiff has failed to support her case of discrimination, citing to the familiar McDonnell Douglas burden shifting analysis. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  As the Court of Appeals has explained, a plaintiff:

> bears the initial burden of establishing a prima facie case by a preponderance of the evidence. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). When a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817. If the defendant meets this burden, the presumption of

discriminatory action raised by the prima facie case is rebutted. <u>Tex. Dep't. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The plaintiff then must establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action. <u>Id.</u> at 253, 101 S.Ct. 1089; <u>McDonnell Douglas</u>, 411 U.S. at 804, 93 S.Ct. 1817.

<u>Sarullo v. U.S. Postal Serv.</u>, 352 F.3d 789, 797-98 (3d Cir. 2003) (footnotes omitted).  Moreover:

To make a showing of a prima facie case of gender discrimination under Title VII, [a plaintiff] must show that: (1) she was a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) members of the opposite sex were treated more favorably. <u>Hugh [v. Butler County Family YMCA]</u>, 418 F.3d [265,] 267 [(3d Cir. 2005)] (citing <u>McDonnell Douglas</u>, 411 U.S. at 802-03, 93 S.Ct. 1817). A plaintiff may also meet the last element by showing that the adverse employment action "occurred under circumstances that could give rise to an inference of intentional discrimination." <u>Makky v. Chertoff</u>, 541 F.3d 205, 214 (3d Cir. 2008).

<u>Burton v. Teleflex Inc.</u>, 707 F.3d 417, 426 (3d Cir. 2013)

Defendant challenges Plaintiff's prima facie case of gender discrimination, contending that her evidence is insufficient to support a reasonable inference that Lamancusa's decision was motivated by gender and that she cannot demonstrate that male detectives were treated more favorably.  Plaintiff responds that she was replaced by a male, which satisfies the fourth prima facie element.  The Court concludes that Plaintiff has stated a prima facie case of gender discrimination.  First, she was replaced by a male and although a plaintiff is not required to establish this fact to state a prima facie case of gender discrimination, <u>Pivirotto v. Innovative Systems, Inc.</u>, 191 F.3d 344, 354 (3d Cir. 1999), such evidence is relevant.  Second, she points to males who were treated more favorably, namely three male detectives whose job performance deficiencies were ignored by Lamancusa.  <u>See</u> <u>Simpson v. Kay Jewelers, Div. of Sterling, Inc.</u>, 142 F.3d 639, 646 (3d Cir. 1998) (evidence that a non-member of the protected class was treated more favorably is enough for purposes of the prima facie case and the issue of whether the individual is "similarly situated" is more appropriately addressed at the pretext stage of the

analysis). Plaintiff refers to three men who were not terminated or even disciplined despite questionable performance issues, which is more than sufficient for purposes of a prima facie case.

By arguing that Plaintiff has not established that Lamancusa's decision was motivated by gender rather than her performance, Defendant is attempting to force Plaintiff to prove that she was discriminated against in order to state a prima facie case. In other words, Defendant has referenced its proffered reasons for Plaintiff's termination in the course of articulating why she cannot state a prima facie case of gender discrimination. To require Plaintiff to rebut this reason in order to establish a prima facie case of discrimination improperly imports into the prima facie analysis the later stages of the <u>McDonnell Douglas</u> test.

As cogently explained by the Sixth Circuit:

> a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case. To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination.

<u>Wexler v. White's Furniture, Inc.</u>, 317 F.3d 564, 574 (6th Cir. 2003) (en banc) (citing <u>Cline v. Catholic Diocese of Toledo</u>, 206 F.3d 651, 660-61 (6th Cir. 2000)). <u>See also</u> <u>Thomas v. Denny's, Inc.</u>, 111 F.3d 1506, 1510 (10th Cir. 1997) ("relying on a defendant's reasons for the adverse employment action as a basis for ruling against a plaintiff at the prima facie stage raises serious problems under the <u>McDonnell Douglas</u> framework because it frustrates a plaintiff's ability to establish that the defendant's reasons were pretextual."); <u>Davenport v. Riverview Gardens Sch. Dist.</u>, 30 F.3d 940, 944 (8th Cir. 1994) ("by requiring plaintiff to disprove the alleged conduct violations in order to establish his prima facie case, the district court essentially required plaintiff, at the outset, to disprove defendant's alleged business reasons for its adverse

employment action–in other words, to prove pretext and the ultimate issue of intentional discrimination.  The prima facie case is not so onerous.")

The burden of production shifts to Defendant to articulate a legitimate, non-discriminatory reason for its action.  Defendant has proffered as its legitimate, non-discriminatory reason for her termination her ongoing problems with interacting with the public, prosecutors in the office and other law enforcement officials.  Defendant has thus satisfied its relatively light burden of production.  Krouse v. American Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997).  Therefore, the burden shifts to Plaintiff to proffer evidence from which the trier of fact could conclude that Defendant's reason is a pretext for unlawful gender discrimination.

The Court of Appeals has explained that:

> To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.  Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (citations omitted).

Plaintiff proceeds along "Fuentes prong one" by arguing that she has submitted evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reason. Keller v. ORIX Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc).  She also proceeds along "Fuentes prong two" by arguing that she has proffered evidence that "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  Keller, 130 F.3d at 1111.

Gender-Related Comments

31

Plaintiff contends that, in the months after hiring her, Lamancusa started having doubts about his decision. On more than one occasion, Lamancusa approached Petyak and asked him if he "had made a mistake hiring a female for the position." (Petyak Decl. ¶ 27.)[20] Lamancusa told Petyak that she did not seem "aggressive" enough (like a man would be) in interviewing suspects and witnesses. (Id.) Petyak assured Lamancusa that her interview style was appropriate for the type of cases she was handling and the types of people with whom she dealt. (Id.) Petyak did not see Wiley's job based on whether a male or female would be more suitable; however, Petyak had the impression that Lamancusa believed that Wiley's gender played a role, especially since Lamancusa brought up the issue on more than one occasion. (Id.)

Martwinski, the detective who later became Wiley's supervisor, told Petyak that she "interviews people like she's asking them on a date instead of treating them as suspects." (Petyak Decl. ¶ 28.)[21] He also made disparaging "dumb blonde" jokes referencing Wiley and the way she worked, sometimes in her presence but just out of her earshot. (Id. ¶ 29.) Defendant notes that, according to Plaintiff, she did not experience any problems working with Martwinski. (Wiley Dep. 34.)

Plaintiff states that Lamancusa was in the detective's office talking to some of her coworkers. He started to ask her a question when her phone rang. She said, "excuse me, I need to take this call" (it was a call regarding an investigation she was working on). Lamancusa turned back to the co-worker and said "she's making dates while at work." (Wiley Decl. ¶ 12.)[22]

Plaintiff often took recorded (audio and video) statements with suspects. Her method of

---

[20] Defendant "denies" this statement but cites no record evidence in support of the denial. It also moves to strike Petyak's declaration. For the reasons discussed above, this portion of Petyak's declaration can be considered in the context of resolving Defendant's motion for summary judgment.

[21] Again, Defendant denies this statement but cites no evidence in support of its denial.

[22] Defendant objects to this statement, but cites no support in the record for the denial.

getting a suspect to get comfortable and talk was to start the interview with the question, "so tell

me about yourself." She found that this approach often put the suspects at ease with the process

and she was able to get the information she needed. Lamancusa reviewed one such recorded

interview and afterwards asked her, "why did you ask him about himself? Were you trying to

date him?" (Wiley Decl. ¶ 13.) Lamancusa denied asking that question. (Lamancusa Dep. 66.)

Plaintiff recalls entering the courthouse while Lamancusa was exiting, at which time

Plaintiff recalls saying "I forgot my phone in the car", and Lamancusa replied, "What is that,

your naughty girl phone." (Wiley Dep. 62-63.) The remark described above made Plaintiff feel

uncomfortable because it was a random comment, no one else was present and it was not a

situation of "friends hanging out having this joking conversation." (Wiley Dep. 63.) Lamancusa

denied making any remark to Plaintiff about a "naughty girl phone." (Lamancusa Dep. 63.)

Plaintiff did not tell any person employed by the County about the remark described above.

(Wiley Dep. 64-65.)

Plaintiff also recalled a remark that she believes was made at the end of summer or

early fall of 2016. (Wiley Dep. 56.) She went to the porch area outside of the District Attorney's

Office, which is used by employees who smoke cigarettes, to talk with him about a case. (Wiley

Dep. 56.) Plaintiff recalls the following persons being present: Lamancusa, Assistant District

Attorney Luanne Parkonen, and Special Projects Coordinator Gary Filippone. (Wiley Dep. 56-

57.) Plaintiff recalls that Lamancusa, Parkonen and Filippone were discussing Lamancusa's

"girlfriend being on a stage for something." (Wiley Dep. 57-58.) Plaintiff did not know anything

more about what was being discussed on the porch when she walked into the conversation.

(Wiley Dep. 57-78.)

When Plaintiff approached Lamancusa on the porch, she recalls him asking her if she

had "ever been on a stage." (Wiley Dep. 55.) Wiley responded "yes" and said that she had been in beauty pageants. (Wiley Dep. 55.) Plaintiff recalls that Lamancusa "kind of laughed" and said, "What was your talent, dancing on a pole?" (Wiley Dep. 55.) Plaintiff recalls Lamancusa also asking, in the presence of Parkonen and Filippone, if there was a videotape of the pageant and saying that he wanted to see the video tape. (Wiley Dep. 60-62.) Plaintiff testified that she mentioned the comment to Martwinski immediately afterward and he had no response; she cannot recall if this occurred before or after he became her direct supervisor. (Wiley Dep. 55-59.) Lamancusa denied having any conversation with Plaintiff as described above; he testified that "it would have never happened. And it did not happen." (Lamancusa Dep. 59-60.)

Martwinski testified that Plaintiff never complained to him about how Lamancusa treated her, nor did she bring any issues to his attention related to the same. (Martwinski Dep. 33.) Plaintiff testified that she mentioned the above-described comment to Luanne Parkonen approximately two weeks after the fact. (Wiley Dep. 58-59.)

Lamancusa's Treatment of Similarly Situated Males

Christian Hauser, who was hired by Lamancusa from the New Castle Police Department to serve as a detective for the County, was assigned to the joint drug task force (while employed by New Castle, he was on the same task force). Petyak, his supervisor, found that he was not doing an adequate job and was derelict in his duties. (Petyak Decl. ¶ 19.) For example, he regularly "hung out" at the New Castle police department with his former work mates and would play video games with them for hours while on duty instead of working. Further, he was not productive; he was not opening or working on a sufficient number of cases (he usually claimed to be working on one case in particular that never amounted to any arrests) and otherwise was a poor performer. (Id.)

Petyak states that he had several conversations with Lamancusa regarding Hauser's lack of performance and violations of policy and procedure (i.e., playing video games on duty). Lamancusa refused to take any action, refused to talk to Hauser about these issues and otherwise refused to take any disciplinary action. (Id.)[23]

Petyak also managed Martwinski. Petyak found that Martwinski had anger issues and would lose his temper very quickly. He often yelled at, berated and humiliated confidential informants and city police officers. When he became aware of these outbursts, he counseled him to "calm down," but his counseling did not have any meaningful impact. From time to time, he reported these issues to Lamancusa because he felt that Martwinski needed to be disciplined by the District Attorney in order to effectuate a meaningful attitude change. However, Lamancusa just shrugged it off and did not take any disciplinary action against Martwinski. (Id. ¶ 20.)

Lamancusa denied that Martwinski had any anger issues, stated that he never received any complaints about any such issues and that he never had occasion to subject him to discipline. (Lamancusa Dep. 68.)

Quentin Emerich was a county detective, working for Lamancusa, when he was involved in an automobile accident which resulted in property damage. Emerich was under the influence of alcohol at the time and was arrested and charged with DUI. This happened in 2013. (Petyak Decl. ¶ 21.)[24] Emerich had DEA credentials at the time. Pursuant to DEA policies, procedures and regulations, Emerich was required to report any arrest or alleged criminal violation/charge involving alcohol or drugs (including an arrest for DUI) to his supervisors who were, in turn,

---

[23] Defendant denies this statement, citing Lamancusa's declaration, but his declaration contains no discussion of Petyak telling him that Hauser was performing poorly. (Lamancusa Decl. ¶ 16.)
[24] Defendant denies that Emerich was involved in a collision with another vehicle (Lamancusa Decl. ¶ 25), but Petyak states only that Emerich's own vehicle sustained damage. Defendant also contends that Petyak has no "personal knowledge" about Emerich's DUI, but he states that Lamancusa told him not to report the incident to DEA.

required to notify the DEA about the circumstances of the arrest and to cooperate with any investigation instituted by that agency. (Id.) Emerich did report the DUI to Frank Drew (who was later selected to replace Petyak) but did not report it to Petyak. Emerich may have also told Lamancusa because he contacted Petyak and specifically told him NOT to report the incident to the DEA and not to take any calls from the DEA if that agency reached out to him. Lamancusa also told Petyak that he was not going to give information to the DEA. (Id. ¶ 22.) Lamancusa denies that he told Petyak not to report the incident to the DEA and states that, to the best of his knowledge, Emerich did report it. (Lamancusa Decl. ¶¶ 23, 32.)

Emerich told Wiley he had been charged with DUI and that Lamancusa got him "out of trouble." Emerich also said "if it weren't for Josh, I would have lost my license and my employment." (ECF No. 24 Ex. E, Pl.'s Answers to Interrog. ¶ 9; see also Wiley Dep. 134.)

Lamancusa denied that he did anything on Emerich's behalf. When asked about this, Lamancusa responded, "You mean commit a crime? That's what that would be. That would constitute a crime. No, I did not make any phone calls. I didn't call the DA of the other county. Because this occurred in another county." (Lamancusa Dep. 99; Lamancusa Decl. ¶¶ 24, 26.)

However, Petyak states that Lamancusa told him that he did, in fact, call Mercer County's District Attorney and arranged for that District Attorney to approve Emerich for accelerated rehabilitative disposition ("ARD") despite the fact that there was property damage involved in the incident, which could have otherwise complicated his ARD eligibility. (Petyak Decl. ¶ 23.) Plaintiff notes that Emerich's driver's license was suspended because of his DUI offense. However, Emerich continued to drive county vehicles while he was on suspension and drove his own vehicle to and from work while on suspension. Lamancusa was aware of this. Not only did he did not discipline Emerich for these violations of the terms of his imposed criminal

sentence, he countenanced and permitted Emerich to do so. (Id. ¶ 24.)  Lamancusa responds that Emerich's suspension could not have been longer than 60 days and that, to his knowledge, Emerich did not drive county vehicles during that time.  He further notes that detectives typically travel two to a vehicle and that, to the best of his knowledge, Emerich received rides to and from work during this temporary suspension period.  (Lamancusa Decl. ¶¶ 30-31.)  The trier of fact will have to hear this disputed testimony and determine the credibility of the witnesses.

Other Issues

Plaintiff testified that she took deposits for the District Attorney's Office to the bank, which also interrupted her other work, and she did not understand why she had been selected to deliver the bank deposits. (Wiley Dep. 67-68.) Plaintiff recalled being called to meetings in Lamancusa's office and then told to wait outside. After waiting, Lamancusa would come out of the office and say, "Oh, I forgot completely about you" and the meeting would not be held. (Wiley Dep. 40-42.)  Plaintiff testified that she viewed this as discriminatory because she did not see that same type of occurrence with other detectives who would be called to meet with Lamancusa. (Wiley Dep. 42.) Plaintiff testified that Detective Martwinski would be called for a meeting with Lamancusa and afterward she would ask Martwinski "Did you have your meeting?" and he would say "Yes." (Wiley Dep. 42.)

Plaintiff recalled being told not to talk on the telephone during conversations with Lamancusa. (Wiley Dep. 42-43.)  Plaintiff recalled an instance when she was in her office with Martwinski, a Special Projects Coordinator (Gary Filippone), and Lamancusa; Plaintiff was working at her desk and Lamancusa was having a conversation with Martwinski and Filippone. (Wiley Dep. 43.) At the end of his discussion with Martwinski and Filippone, Lamancusa began to talk to Plaintiff when her phone rang. (Wiley Dep. 44.) Plaintiff took the call because it was

someone that she had been trying to get in touch with for days about a bad check case. (Wiley Dep. 44.) According to Plaintiff, Lamancusa told her not to take calls when he is speaking with her and that she should talk with Martwinski about it if she did not understand. (Wiley Dep. 44-45.) Lamancusa then gave Plaintiff some information about a case and left the room, after which Martwinski told her not to answer the phone when Lamancusa is in the room. (Wiley Dep. 45.)

Fuentes Prong One

Plaintiff proceeds under Fuentes prong one by pointing to inconsistencies in Lamancusa's explanations: he never documented the criticisms he cites and his complaints are undermined by her three-year tenure without major incidents, his alleged decision to "interact with her less frequently" hardly makes sense, and Petyak disputes his criticisms of her when she started.

Defendant argues that, as a Row Officer, Lamancusa was not required to utilize progressive discipline when dealing with Wiley. See Smith v. City of Allentown, 589 F.3d 684, 692 (3d Cir. 2009) (summary judgment properly entered against plaintiff who, inter alia, failed to produce evidence that the City had a mandatory progressive disciplinary policy or that the defendants deviated from such policy).

However, Lamancusa testified that "the discipline that … I exhibited upon Stacey Wiley was progressive verbal discipline for numerous years, culminating in her termination." (Lamancusa Dep. 54.) Plaintiff denies Lamancusa's history, stating that she met with him infrequently, that she was not told that her interaction with the public was an issue or that she should be more responsive to their concerns, and that there were only two isolated incidents during which Lamancusa told her to "work on her people skills" after one of which he called her back and said "don't worry about it, everything is good." (Wiley Dep. 36.)

As Plaintiff notes, Lamancusa's complaints about her performance are painted in broad strokes:

- She was "always" searching for the answer that she wanted when it came to legal issues involving her work, versus what the answer actually was (Lamancusa Dep. 19-20);

- The ADAs with whom she worked were "always" frustrated with her (Lamancusa Dep. 21);

- She continued to rebuff inquiries from the public, creating a problem that repeated itself "over and over" and "regularly" (Lamancusa Dep. 33; ECF No. 24 Ex. D ¶ 5);

- Her desire to assert herself as having higher authority over other local law enforcement officers "never" improved (Lamancusa Dep. 43-44);

- Her problems responding and interacting with police officers "never" stopped or changed (Martwinski Dep. 34-37);

- Her problems with interactions with the public, prosecutors and local law enforcement became "more, and not less" prevalent over time (Lamancusa Dep. 18-19);

- Lamancusa would talk to her about issues or handling situations, but she just "never" seemed to get it; the same issues kept coming up "all the time" (Lamancusa Dep. 26-27).

Despite this extensive list of ongoing serious problems, Lamancusa never did anything other than verbally counsel Plaintiff, never documented his concerns, decided to "interact with her less frequently" and then, three years later, suddenly terminated her employment. In addition, as cited above, Petyak states that she seemed genuinely interested in her job, she took it seriously and, from what Petyak observed, was doing a good job despite her lack of law enforcement experience. (Petyak Decl. ¶ 25.) Based on Petyak's observations, she was effective at her job. She handled the public and witnesses well. Petyak never heard that members of the public, other police officers or witnesses had any problems with how she performed or how she interacted with them. She handled herself professionally and responsibly. (Id. ¶ 26.) Petyak's observations are in stark contrast to Lamancusa's and present a credibility issue for the trier of fact to resolve.

In addition, although Lamancusa apparently had the discretion to dispense with making a

written record, his choice to do so permits Plaintiff to counter his version of events with her own recollection that she was not counseled frequently by him and was completely surprised when she was called into his office on January 5, 2017 and terminated.  This creates a dispute of material fact that cannot be resolved in the context of a motion for summary judgment.

Defendant also argues that Lamancusa testified that he never had to discipline anyone other than Wiley.  (Lamancusa Dep. 54.) However, Plaintiff has pointed to evidence that other detectives engaged in behavior discussed herein (angry outbursts, goofing off) that Lamancusa chose to ignore rather than impose discipline.

The Court concludes that Plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Burton, 707 F.3d at 427.

### Fuentes Prong Two

Plaintiff also proceeds along Fuentes prong two by: noting that Lamancusa asked Petyak if he had made a mistake hiring a woman for the position;[25] citing Martwinski's "dumb blonde jokes"; citing Lamancusa's inappropriate sexist remarks; and referring to Lamancusa's treatment of male detectives more favorably.  Defendant argues that "stray remarks" do not establish pretext and that the individuals Plaintiff cites are not true comparators.

The Court of Appeals has held that: "Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if

---

[25] Defendant argues that Plaintiff's case is undermined by the fact that Lamancusa was the same individual who hired her and discharged her "within a short period of time" (ECF No. 20 at 7)—despite the fact that Defendant also contends paradoxically that Petyak's evaluation of Plaintiff's performance from when she started working is too remote in time to be relevant to Lamancusa's decision to terminate her.

they were made temporally remote from the date of decision." Fuentes, 32 F.3d at 767 (citation omitted).

The Court of Appeals has held that:

> "When considering whether remarks are probative of discrimination, we consider the speaker's position in the organization, the content and purpose of the statement, and the "temporal connection between the statement and the challenged employment action." Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 133 (3d Cir. 1997). Here, although several of the statements were made by LSS executives, they were temporally remote from the decision to discharge Appellants, and completely unrelated to the investigation regarding Appellants' violation of the EC Policy. Thus, the comments qualify as "stray remarks" and are entitled to minimal weight. See Ezold v. Wolf, Block, Schorr & Solis–Cohen, 983 F.2d 509, 545 (3d Cir. 1992).

Hodczak v. Latrobe Specialty Steel Co., 451 F. App'x 238, 241 (3d Cir. 2011). However, "statements temporally remote from the decision at issue may properly be used to build a circumstantial case of discrimination." Abrams v. Lightolier, Inc., 50 F.3d 1204, 1214 (3d Cir. 1995).

In this case, Lamancusa was the decisionmaker and Plaintiff's entire employment lasted three years. Thus, it cannot be stated that his alleged sexist remarks were temporally remote from the decision to terminate her employment, even if the dates of various remarks were more exact. Moreover, Lamancusa's alleged questioning of whether he should have hired a woman for this position, even if made shortly after he hired her, is relevant to a determination of whether a subsequent decision to terminate her employment was motivated by gender discrimination.

Analysis of Comparator Evidence

"Whether a comparator is similarly situated is "usually a question for the fact-finder," and summary judgment is appropriate only when "no reasonable fact-finder could find that plaintiffs have met their burden on the issue." Coleman v. Donahoe, 667 F.3d 835, 846-47 (7th Cir. 2012) (citation omitted). The court "noted with some concern the tendency of judges in

employment discrimination cases to require closer and closer comparability between the plaintiff and the members of the comparison group." Id. at 851-52 (citation omitted).

Defendant argues that the individuals Plaintiffs cites are not true comparators: Martwinski's alleged "anger issues" are vague and unsupported, Emerich's off-duty DUI is not comparable to Plaintiff's chronic problems dealing with members of the public, prosecutors and local law enforcement,[26] and Plaintiff never cited Hauser as a comparator until she filed her brief in response to the motion for summary judgment.

Plaintiff responds that she first learned about Hauser's behavior during an interview with Petyak (who was identified as a potential witness in discovery) in November 2018 and that the misconduct she cites by Hauser, Emerich and Martwinski is much more egregious than the conduct that allegedly resulted in her termination. Moreover, "precise equivalence of culpability between employees" is not required, only that they be engaged in acts of "comparable seriousness." McClain v. Pennsylvania Dep't of Corrections, 2011 WL 2670204, at *8 (W.D. Pa. July 7, 2011).

The Court concludes that Plaintiff has cited to sufficient evidence under Fuentes prong two to survive Defendant's motion for summary judgment. Defendant cites to no support for its contention that Hauser's alleged dereliction of duty, Martwinski's alleged anger issues and Emerich's alleged failure to promptly report his DUI and comply with the restrictions thereof are "minor" as compared to Lamancusa's contentions about her performance, which he did not act on (other than verbal counseling) for three years and never documented. The trier of fact will have to consider this evidence and determine the credibility of these witnesses.

---

[26] Somewhat bizarrely, Defendant contends that Emerich's DUI charge occurred three years prior to Plaintiff's termination and is thus immaterial (ECF No. 29 at 6); the issue is whether the behavior is comparable, not when it occurred.

For all of these reasons, Defendant's motion for summary judgment will be denied.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACEY WILEY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | Civil Action No. 17-1214 |
| | ) | |
| LAWRENCE COUNTY, | ) | |
| Defendant. | ) | |

ORDER

AND NOW, this 12th day of March, 2019, for the reasons cited above,

IT IS HEREBY ORDERED that the Motion to Strike Declaration of Andrew J. Petyak,

Jr. or, in the Alternative, to Strike or Disregard Segments of Declaration of Andrew J. Petyak, Jr.

and Corresponding References to Same in Plaintiff's Summary Judgment Filings (ECF No. 28)

filed by Defendant, Lawrence County, is granted with respect to paragraphs 6-10 and 13-17 of

the Petyak Declaration and denied with respect to paragraphs 18-29.

IT IS FURTHER ORDERED that the motion for summary judgment filed by Defendant,

Lawrence County (ECF No. 19), is denied.


s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge